NATIONAL PROPERTIES
CORPORATION,
Appellant,

v.

POLK COUNTY, State of Iowa, Board of Supervisors, Polk County, Board of Drainage Administrators, District # 51, Appellees.

No. 85–52.

Supreme Court of Iowa.

April 16, 1986.

Kristine M. Fasano, Des Moines, for appellant.

James A. Smith, Co. Atty., and David W. Hibbard, Asst. Co. Atty., for appellees.

Considered by REYNOLDSON, C.J., and UHLENHOPP, McGIVERIN, CARTER and WOLLE, JJ.

UHLENHOPP, Justice.

Plaintiff National Properties Corporation appeals from adverse judgment on jury verdict in an action based on an alleged oral agreement by defendants Polk County and Polk County Drainage Administrators, District # 51, to compensate plaintiff for the fair market value of plaintiff's property taken for drainage purposes. Defendants deny plaintiff's allegations in part. They also assert the affirmative defense that a drainage easement was purchased in 1955, or obtained by prescription in 1966, from plaintiff's predecessors in title; that the present use was within the easement; and that the current oral agreement was to compensate plaintiff for property taken in excess of this easement.

A prior jury trial of this contract claim resulted in a judgment for plaintiff which was reversed on appeal for a new trial. *National Properties Corp. v. Polk County*, 351 N.W.2d 509 (Iowa 1984).

We present the evidence in the light most favorable to the jury verdict for defendants. *Lambert v. Sisters of Mercy Health Corp.*, 369 N.W.2d 417, 418 (Iowa 1985). The evidence presented at the second trial was substantially the same as at the first trial. We deviate in brackets and make insertions to our prior description where the record and issues differ from those in the prior trial. We stated in the former opinion:

> The evidence disclosed that in 1955 a large drainage district was formed in northern Polk County, Iowa, including lots 122 and 123 of Highland Park Acres, an official plat. These lots are bordered on the north by a street designated northwest 47th Place [Lee Street]. Lot 122 was bounded on the west by northwest Second Avenue. Earlier in 1942, the then lot owners, including contract vendees Earl V. and Ethel L. Streeter, had conveyed [an easement] to the state of Iowa "for road purposes and for use

as a Public Highway" the west sixty feet and the north 40 feet of lot 122 and the north 40 feet of lot 123. Other documentary evidence ... from the Polk County auditor's office related to the establishment of drainage district # 51 and disclosed that damages to "E.V. and E.L. Streeter" were assessed and paid for drainage ditch right of way. [Records referring to J.L. and J.W. Streeter rather than the predecessor in title E.V. and E.L. Streeter were clarified by notation showing amounts were paid to E.V. and E.L. Streeter. The records clearly identified the property by lot numbers.] Streeters received $467.70 for .0860 acres in lot 122 and $351.81 for .2165 acres in lot 123, Highland Park Acres. At trial a Polk County [drainage district official] computed a total of 13,177 square feet had been taken from these owners for the ditch. [The official also calculated the forty-foot road easement on lots 122 and 123 to be 10,200 square feet. The acreage noted in the auditor's records as having been paid for in 1955 represents more than the road easement.]
>
> Plaintiff corporation acquired these lots in 1973 from Gulf Oil Corporation by special warranty deed that excepted from the conveyance the west 60 feet and the north 40 feet of lot 122, and the north 40 feet of lot 123, subject to "any state of facts and conditions that an accurate survey and personal inspection of the premises would disclose."

*National Properties Corp.*, 351 N.W.2d at 510. The sales agreement contained similar language. Evidence was undisputed that a boundary survey was completed by Gulf pursuant to that agreement and was reviewed by Raymond DiPaglia, plaintiff's president and chief operating officer. Neither the alleged survey, nor references to its contents, are in the record. DiPaglia testified:

> When we originally made the offer on this property, we were told that what we were buying was the property not including the ditch. When the abstract showed up, it showed that it also included the ditch, and we did not want to buy unusa-

ble property, so I was instructed by the attorney to go out and make a physical inspection of the property, which I did.... I physically walked over the property, and particularly the part that pertained to this ditch [and found] all of the creek was well within at least 10 or 15 feet of this 40 foot exception that is spelled out in this abstract.

Reverting to our previous opinion:

In 1980 the Polk County supervisors determined to clean out the open ditch in district # 51 and restore it to its original efficiency. There was little dispute that along plaintiff's property it had been encroached upon, caved in, and overgrown with trees and brush. County employees sought to obtain a work permit to enter plaintiff's property to do the necessary work.... DiPaglia refused permission. [He testified he refused only when he learned the "repair" would widen the ditch and move plaintiff's fence.] He contended the county had no right on the premises because his abstract showed no recorded easement for the 1955 acquisition for the ditch. He also asserted the total ditch easement lay entirely within the 40-foot tract conveyed to the state in 1942.

DiPaglia testified county employees agreed the district's alleged "easement" was invalid and agreed to pay plaintiff the fair market value of any land taken by the new work, whereupon he agreed to permit them to come on the premises and complete their project. The county employees testified they did not concede the district had no right of way on plaintiff's property, but did agree the county would compensate plaintiff for an easement across any land not covered by the 1955 easement.

*Id.* at 510. DiPaglia testified at the present trial regarding the agreement:

Q. Okay. What exactly was discussed on this meeting of July 8th, 1980? A. Okay. It was discussed that, first of all, they didn't have any easement. Secondly, that they were going to pay us for all of the property that they took south of that 40-foot D.O.T. strip. And it was also, since it was not determined exactly how much land they were going to take, I had an absolute promise from David Hibbard that within three or four weeks, that we should have ironed out two things. Number one, the amount of land they were going to take, because they would have completed the job in just a matter of days thereafter. And, number two, what they thought the land was worth. And number three, if we could not agree on what they thought the land was worth, that we would revert to an appraisal method, their choosing an appraiser, we choose an appraiser, and if they can't agree, another appraiser would have been called in for the three of them to work it out.

Steven Gast, the drainage district supervisor, testified in this trial regarding the alleged agreement:

Q. What was your resolution or recollection of where you came away from the meeting with: What was your impression? A. Mr. DiPaglia would allow us to continue construction. He was still concerned that the county would be taking additional right-of-way. Our position was that we would not be taking additional right-of-way and we would finish construction.... The impression I came away with was that Mr. DiPaglia would allow us to continue work on the repair of the drainage ditch, and that after we had completed the work if we strayed or if we took land outside the previous easement, that we would agree to compensate him.

Richard Dolash made a memorandum to his file on July 8, 1980, concerning the meeting with DiPaglia. The memo stated:

Meeting this date at Polk County Engineering Department with Steve Gast, Polk County Physical Planning; Dave Hibbard, Polk County Attorney's Office; Dick Dolash, Polk County Engineer's Office; and Ray DiPaglia, National Properties. Mr. DiPaglia was informed that the forty-foot easement obtained by IDOT along the north side of Lots 122 & 123

for 2nd Avenue construction in 1942 may not be the same as the ROW paid for in approximately 1956 for construction of DD # 51. It was agreed that apparently the ROW or easement purchase for the ditch was never recorded, and that a description of the ROW is not available to reestablish the original ditch ROW line. Mr. DiPaglia noted that his abstract makes no reference to the ditch. It was agreed that the county should proceed with construction as planned, and a mutually agreeable solution as to existing ROW and compensation for any additional ROW will be worked out later.

Returning to our prior opinion:

The work [began in July] 1980. It consisted of cleaning out the ditch, regrading the surface, narrowing the base of the ditch, lengthening the slope, and widening the top of the levee. Plaintiff calculated the total widening at about [6920] square feet. A chain link fence plaintiff had built to the north of a masonry building on the land was moved 13 to 20 feet closer to the structure. Defendant's evidence indicated it was constructed partially on the ditch slope.

At trial plaintiff's appraiser fixed plaintiff's damages at [$17,560]. His opinion was based on a taking of about 6300 square feet in fee, in addition to severance damages [and changes in the quality and condition of the land]. Defendants [presented no evidence concerning damage].

*Id.* at 510–11.

While the as-built survey of the original district # 51 ditch was apparently lost in the process of prior litigation, defendants did have on file a *proposed* plan of that ditch. They endeavored to show the ditch was built in accordance with that plan through a subsequent as-built survey of a segment of the ditch obtained from the Iowa Department of Transportation. Witness Snyder, a land surveyor, compared the department's survey with the proposed plan and verified that the original ditch was built as proposed. Snyder also surveyed the land following the 1981 repairs

and showed that the ditch as repaired did not extend as far onto plaintiff's land as the original ditch extended. Snyder's final answer on this point was as follows:

Q. So the ditch is constructed or as repaired rather, the ditch as you surveyed it, takes up less of the plaintiff's land than the proposed ditch took up?
A. That is correct.

Plaintiff asserts several grounds on appeal, and we address each in turn.

I. Unfortunately, some of the records relating to the original ditch easement were lost in litigation prior to 1980. Plaintiff objects to the admission of several exhibits obtained from the county auditor's remaining records. These exhibits include the "proposed" plan for excavation of drainage ditch # 51 and several records indicating the then owners of lots 122 and 123 were paid a "right-of-way award" and "damages" and a notation of the acreage involved. Plaintiff's argument appears to be that, because these records were not in the drainage district book in the auditor's office but were stored elsewhere, and no evidence was introduced regarding their location in 1972 and 1973 when plaintiff purchased its land, they are immaterial and irrelevant to the proceedings.

The exhibits were useful to the defense of the case for two purposes: to prove notice to plaintiff of a purchased drainage easement, and to prove the consent of plaintiff's predecessors in title necessary to establish a drainage easement by prescription.

In the first trial, "plaintiff's counsel persuaded trial court that unless such evidence was recorded in the recorder's office it was ineffective in establishing any prior rights in plaintiff's land." *Id.* at 511. On the first appeal we held exclusion of auditor's records on that basis was error. *Id.* at 512. We explained:

Actual notice depends upon the purchaser having either actual knowledge of the easement or knowledge of sufficient facts to charge him or her with a duty to make inquiry that would reveal the existence of the easement. One who purchas-

es land with knowledge of such facts as would put a prudent person upon inquiry which, if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely by another, is chargeable with the actual notice he or she would have received.

*Id.* at 511 (citations omitted). The records are clearly relevant to the determination of whether plaintiff should be charged with notice of their contents.

■ But plaintiff asserts that, to impute knowledge of their contents, records must be kept in the drainage district book pursuant to section 455.185 of the Iowa Code. That section provides:

> The board shall provide a drainage record book, which shall be in the custody of the auditor, who shall keep a full and complete record therein of all proceedings relating to drainage districts, so arranged and indexed as to enable any proceedings relative to any particular district to be examined readily.

The records introduced, however, are of the type referred to in the next section 455.186. That section provides:

> All reports, maps, plats, profiles, field notes, and other documents pertaining to said matters, including all schedules, and memoranda relating to assessment of damages and benefits, shall belong to the district to which they relate, remain on file in the office of the county auditor, and be matters of permanent record of drainage proceedings.

Thus the records in question were not required to be kept in the drainage district book itself. The records were filed in the auditor's office and were stored by the auditor. They were under the control of the auditor and were the auditor's files.

The physical location of the challenged exhibits was not shown by direct testimony. An auditor's office employee as well as the drainage district manager, Jim Stuart, both "presumed" the exhibits were in the auditor's office in 1972 and 1973. Stuart testified that in 1975 through 1979 he retrieved the records from the auditor's archives located in the basement of the county courthouse and relocated them in his office in the physical planning department. Both testified that the records were under the control of the auditor.

■ Plaintiff does not contend that if in 1972 and 1973 it had sought out information in the auditor's office relating to its property, the information would not have been made available for inspection. Defendants introduced testimony that the county archivist would have been available to retrieve such documents and that a surveyor would have turned up these documents. The reality of county office space and the never-ending problem of document storage dictate that the requirement of section 455.186 (the documents "remain on file in the office of the county auditor") does not require their physical presence within the four walls of the office itself. The physical location of the records is material to the issue of whether a reasonably prudent person searching with ordinary diligence would have discovered them. *National Properties Corp.*, 351 N.W.2d at 511.

Plaintiff urges, however, that even if the records are admissible, the trial court erred in instructing the jury regarding actual notice. Plaintiff's argument is two-fold. First, plaintiff attacks instruction 12 on the ground that it burdened plaintiff with the content of unreliable records the location of which was not known in 1972 and 1973. Second, plaintiff asserts the record does not contain substantial evidence to submit the issue of actual notice from the records.

Instruction 12 states in pertinent part:

> Actual notice depends upon the purchaser having either actual knowledge of the easement or knowledge of sufficient facts to charge a reasonably diligent and prudent purchaser with the duty to make reasonable inquiries that would reveal the existence of the claimed easement. One who purchases land with knowledge of such facts as would put a prudent person upon inquiry, which if prosecuted with ordinary diligence, would lead to actual notice of rights claimed adversely

by another, is chargeable with the actual notice he or she would have received.

Under the facts and circumstances of this case, if you find that the plaintiff purchased the property for valuable consideration without actual notice of the outstanding interest, if any, of the defendants, then plaintiff's interest in the property is protected and the defendants' interest, if any, cannot be enforced against the plaintiff.

However, if you find from the evidence that the plaintiff acting as a reasonable person knew or should have known that a drainage ditch as opposed to a natural stream was located on plaintiff's property at the time the plaintiff purchased the property then the plaintiff had a duty to make an investigation as a reasonably prudent person would make under like circumstances to investigate the possible existence of outstanding rights hostile to its own title. The plaintiff would be charged with such knowledge of the outstanding rights, if any, hostile to its own title as that investigation would have revealed.

Under the facts and circumstances of this case this means that if the plaintiff knew or should have known that a drainage ditch as opposed to a natural stream was located on his property the plaintiff would have been under a duty to investigate the existence of any easement concerning the drainage ditch which would have included the search of the Auditor's Office Drainage District records and the plaintiff is charged with all knowledge which such search would have revealed concerning the existence of any drainage easement.

As the Court has pointed out during the trial the plaintiff acting as an ordinarily reasonably prudent person was not required to search the Iowa Department of Transportation records to ascertain any drainage district easement.

■ The location of the records in 1972 and 1973 is relevant to the issue of whether a reasonably prudent person faced with like circumstances would have found these documents. The trial court did not instruct that plaintiff was burdened with actual knowledge of these documents. The instruction only required a search that a "reasonably prudent person would make under like circumstances." The court correctly instructed that a reasonably prudent person would search the *auditor's* office records. *Id.* at 512. A reasonably prudent person would not be required to search the records of Iowa Department of Transportation, and the court properly so cautioned the jury. Whether the documents in question would have been located by a search of the auditor's office, or whether the documents would otherwise have been located by a reasonably diligent search, was left to the jury.

■ The reliability of the documents was a question for the jury in their determination of whether a reasonably diligent search would lead to actual notice of an adverse claim of right to the property. *See National Properties Corp.*, 351 N.W.2d at 511.

■ Plaintiff's second argument, that the evidence was insufficient to submit the issue of actual notice of a 1955 easement, is also without merit. As we stated in our earlier opinion:

We believe the record ... in this case would have permitted a jury finding that enough of the ditch was upon plaintiff's property to put it upon inquiry, and such an inquiry, pursued with ordinary diligence, would have led to the auditor's office and actual knowledge of the 1955 taking from plaintiff's predecessor's in title. Under this record, it could also have revealed the right-of-way plan for the ditch, and a cross-section showing the bottom of the ditch, slopes, levee and back slopes to be approximately 71 feet wide—too wide to be contained within the 40-foot strip conveyed to the state.

*Id.* at 512.

While we agree the existing records are less than ideal to prove defendants' contention, a jury question existed.

II. Defendants asserted alternatively that their rights in plaintiff's property were based on an easement by prescription. Plaintiff challenges the sufficiency of the evidence supporting submission of this defense to the jury.

"It is well established a drainage easement may be acquired by prescription." *Gilmore v. New Beck Levee District*, 212 N.W.2d 477, 479 (Iowa 1973). While adverse possession usually requires a claim of right or color of title,

> we have modified the requirements to establish an easement by prescription in those instances in which the original entry upon the lands of another is under an oral agreement or express consent of the servient owner and the party claiming the easement expends substantial money or labor to promote the claimed use in reliance upon the consent or as consideration for the agreement. In such situations we do not apply the strict rules....

*Simonsen v. Todd*, 261 Iowa 485, 495, 154 N.W.2d 730, 736 (1967). This modification is most frequently applied in drainage cases. *Id.* at 489, 154 N.W.2d at 733. Substantial evidence in this case supports the modified proof requirements that "there may be a prescriptive easement where the original use was with a servant owner's consent and usage as of right has continued more than ten years." *Anderson v. Yearous*, 249 N.W.2d 855, 861 (Iowa 1977); *Loughman v. Couchman*, 242 Iowa 885, 889, 47 N.W.2d 152, 154 (1951).

█ Plaintiff argues defendants failed to establish by clear and convincing evidence that plaintiff's property was burdened by the drainage servitude for the applicable prescriptive period, and asserts the pertinent time segment for prescription was the ten-year period just prior to 1980. In this plaintiff is mistaken. The existence of the ditch for the first ten years of its existence establishes an easement. *McKeon v. Brammer*, 238 Iowa 1113, 1119, 29 N.W.2d 518, 522 (1947); 28 C.J.S. *Easements* § 7, at 642 (1941) ("The period required for prescription begins to run from the time some act is done or fact exists

which gives the party, against whom the right of easement is claimed, a cause of action."). Thus the prescriptive easement here, if it existed, would have vested ten years after construction of the ditch in approximately 1956. (While the district was established in 1955, the ditch was apparently constructed a year later.) The extent of the easement is measured by the use under which it was acquired. *Gilmore*, 212 N.W.2d at 480. Once established the easement is equivalent in all respects to an easement by grant. *McKeon*, 238 Iowa at 1119, 29 N.W.2d at 522.

█ The record contains sufficient evidence to support a finding that a prescriptive drainage easement vested in the area in question. Under the record, the jury could have reasonably determined the ditch was built in accordance with the proposed plans which locate portions of the ditch, including the ditch bank and levees, south of the forty-foot road easement.

█ The ditch was neglected and fell into a state of disrepair in the twenty-four years after construction. Plaintiff contends the waterway pursued its natural course on the north forty feet of the lots and the ditch banks silted in. Once established, however, an easement by prescription "can only be lost by at least ten years of continued nonuse accompanied by facts and circumstances clearly indicating an intentional relinquishment." *Anderson*, 249 N.W.2d at 863. *See* 28 C.J.S. *Easements* § 13(i), at 652 (interruption of continuous use following period of prescription is not fatal unless it amounts to abandonment).

█ Plaintiff had to prove abandonment by clear and convincing evidence. *Page v. Cooper*, 243 Iowa 836, 840, 53 N.W.2d 765, 767 (Iowa 1952). Plaintiff did not establish abandonment as a matter of law. Even if the easement was not used by defendants for a full ten-year period after its establishment, "such non-user is subject to explanation, and if it appears that the owner had no intention of abandoning his easement no abandonment will be found." *Presbyterian Church v. Hark-*

*en,* 177 Iowa 195, 206, 158 N.W. 692, 696 (1916). Where a drainage way continues to carry off water, silting and erosion of the ditch cannot be equated with abandonment. *Anderson,* 249 N.W.2d at 862.

A more troublesome question is whether plaintiff had notice of the prescriptive easement at the time it purchased the property, or whether such notice is required. Following the initial ten-year period, an easement by prescription would be completely enforceable against the original owner of the burdened estate if he were still the owner. *McKeon,* 238 Iowa at 1119, 29 N.W.2d at 522. Here, however, plaintiff purchased the property approximately seven years following the vesting of the easement. The rule is "that a purchaser of the servient estate will be charged with notice of all apparent easements and the purchaser is bound where a reasonably careful inspection of the premises would disclose the existence of the easement." *Id.* at 1120, 29 N.W.2d at 522.

In several cases this court has found the purchaser of a servient estate had notice of a drainage ditch despite evidence that the ditch had silted in and was overgrown with brush and trees. *See e.g., Anderson,* 249 N.W.2d at 863; *Hatton v. Cale,* 152 Iowa 485, 498, 132 N.W. 1101, 1106 (1911) (Where the ditch in question was continuous and ran onto and across the land purchased by the defendant, "This is all the notice that was required."); *Brown v. Honeyfield,* 139 Iowa 414, 418, 116 N.W. 731, 732 (1908); *Hale v. Hulin,* 130 So.2d 519, 520 (La.App.1961) ("despite evidence that the ditch was at times neglected and allowed to become obscured with weeds and bushes, it nevertheless continued to drain plaintiffs' property and its character as a continuous and apparent servitude was not changed").

■ The record contains evidence from which the jury could find a levee and some portion of the south bank of the ditch were on plaintiff's property at the time of purchase. *Gilmore v. New Beck Levee District,* 212 N.W.2d 477, 479 (Iowa 1973) ("It is true the drainage levee is open and obvious evidence the land was subject to some

kind of servitude"). Further, the qualifications in the special warranty deed from plaintiff's predecessor in title, coupled with DiPaglia's own testimony that he physically walked off the property as it pertained to the ditch because of concern that he was purchasing unusable property, could be found to establish that plaintiff had knowledge of a servitude on the property. *Brown,* 139 Iowa at 418, 116 N.W. at 732.

We thus reject plaintiff's propositions on this branch of the case.

■ III. Plaintiff objected to the admission into evidence of two surveys because they were not certified pursuant to section 622.42 of the Code:

A copy of the field notes of any surveyor, or a plat made by the surveyor and certified under oath as correct, may be received as evidence to show the shape or dimensions of a tract of land, or any other fact the ascertainment of which requires the exercise of scientific skill or calculation only.

Defendants' exhibit R, the 1956 proposed plan for the ditch, was admitted into evidence over plaintiff's objection following identification and authentication by defendants' agent, Richard Dolash. The document was kept on file in the auditor's office.

Exhibit Q is a survey by the Iowa Department of Transportation for proposed reconstruction of Second Avenue. The trial court admitted the survey over plaintiff's objection, admonishing the jury that plaintiff was not obligated to search that department and that notice to plaintiff could not be imputed from it.

Plaintiff argues that defendants were required to have these surveys certified in accordance with section 622.42. The contention is without merit. Section 622.42 merely provides one method of authentication of surveys. The surveys in question were public documents as well, and were admissible after defendants laid a foundation. Iowa R.Evid. 901(b)(7); *see* rule 803(8).

IV. The trial court refused to instruct on the issue of trespass as requested by

plaintiff. The refusal was based on holding that a drainage district is a municipality, and that the requirements of chapter 613A of the Iowa Code were not met. Defendants assert the case is controlled by our recent opinion in *Fisher v. Dallas County*, 369 N.W.2d 426 (Iowa 1985). We agree with defendants.

In *Fisher* we explained the "limited nature of a drainage district's purposes and powers" and the "limited circumstances in which a drainage district is subject to suit." *Id.* at 429. "Our cases have consistently held that a drainage district is not susceptible to suit for money damages. It has no corporate existence for that purpose." *Id.* Further, "[n]either the county nor the board of supervisors can be vicariously liable for a money judgment against a district." *Id.* at 430. Plaintiff's argument that defendants' failure to assert this defense at the trial court level must also be rejected. The district is only amenable to suits "to compel, complete, or correct the performance of a duty or the exercise of a power by those acting on behalf of a drainage district." *Id.* at 429.

V. At the close of the evidence, plaintiff sought to amend its pleadings and requested the trial court to instruct on accord and satisfaction. The trial court refused, holding that its contract instruction adequately covered the issue. Accord and satisfaction is

> [a] method of discharging a claim whereby the parties agree to give and accept something in settlement of a claim and perform the agreement, the "accord" being the agreement and the "satisfaction" its execution or performance, and it is a new contract substituted for an old contract which is thereby discharged, or for an obligation or cause of action which is settled, and must have all the elements of a valid contract. *Holm v. Hansen*, 248 N.W.2d 503, 506 (Iowa 1976).

Black's Law Dictionary 16 (5th Ed.1979).

■■■ Where a claim is covered adequately by another pleading, denial of an amendment is proper. *I.G.L. Racquet Club v. Midstates Builders Inc.*, 323 N.W.2d 214, 217 (Iowa 1982). We do not disturb the trial court's decision. Plaintiff's claim here is basically no different than its amended petition on contract. If the trial court's contract instruction was somehow deficient or incorrectly stated plaintiff's claim, objection should have been made to that instruction.

■■■ VI. In the course of cross-examination, defense counsel asked questions concerning the records we have previously considered and used the terms "easement", "purchase", and "acquired". Plaintiff's objections that the questions assumed facts not in the record were overruled. While the questions were improperly phrased, they did not result in reversible error.

The questions asked were of the following nature:

Q. Is [the reason no necessity existed to notify Mr. DiPaglia or the other property owners that you were going to do the repair] because your repair was not going to go outside of the boundaries of the easement previously purchased?

. . . .

Q. Do you know how many square feet of land in lots 122 and 123 are shown by those documents to have been purchased?

. . . .

Q. Can't put all of the drainage right-of-way easement purchased from the Streeters in this 40 foot easement on Exhibit 32, can you?

Where a question assumes a fact in controversy, so the answer may really or apparently admit that fact, it is leading. *Giltner v. Stark*, 219 N.W.2d 700, 713 (Iowa 1974). The underlying problem with the defense attorney's questioning was that leading questions were being asked of friendly witnesses. Plaintiff was obliged to call agents and employees of defendants to prove its case in chief. Those witnesses were clearly adverse to plaintiff. Cross-examination by defendants in the leading question format as we have exemplified should on objection, have been frowned on by the district court.

Rule 611 of the rules of evidence states:

Leading questions should not be used on the direct examination of a witness

except as may be necessary to develop that witness' testimony. Ordinarily leading questions should be permitted on cross-examination. When a party calls a hostile witness, an adverse party, or a witness identified with an adverse party, interrogation may be by leading questions.

Our recent change in this rule, deleting the phrase "of a hostile or adverse witness only" from the second sentence, was not intended to change our view that leading questions on cross-examination of a favorable witness are not favored. *See* McCormick on Evidence § 6, at 10 (2d ed. 1972).

We find, however, that no material prejudice to the rights of plaintiff resulted from the leading questions because defendants elicited substantially the same testimony from the witnesses in defendants' case in chief. *State v. Fiedler*, 260 Iowa 1198, 1202, 152 N.W.2d 236, 239 (Iowa 1967).

■ VII. Five exhibits which plaintiff sought to introduce were excluded by the trial court on the basis of defendants' attorney-client privilege and attorney work product. The exhibits, obtained from the Polk County Planning and Zoning Department, were commingled with other information in the district # 51 file. The file was turned over to plaintiff's attorneys at their request, although the exact circumstances are somewhat disputed.

The excluded exhibits included (1) a memo from the drainage district project administrator, Gary Pryor, to Assistant County Attorney Hibbard, in part requesting Hibbard to proceed with condemnation proceedings and further containing a handwritten note from Hibbard to the project engineer, Richard Dolash; (2) a memo from Pryor to Dolash concerning Pryor's conversation with Hibbard about the need for condemnation of easements so that construction may be continued, and the possibility of an injunction by National Properties; (3) a memo from Hibbard to Pryor noting that Dolash believed condemnation was unnecessary because of an existing easement; (4) a cover note from Dolash to Hibbard relating attached records showing

payment for right-of-way of lots 122 and 123; and (5) a memo to Dolash from another agent of the district, Brent, relating the discussions in a meeting with Hibbard and Gast. The memo stated Hibbard's belief that perhaps additional right-of-way needed to be purchased, and further that National Properties likely could not afford to post a bond to obtain an injunction.

Plaintiff contends these exhibits were not privileged communications or work product. Plaintiff further asserts that if the exhibits are privileged, the handing over of them by defendants constituted waiver of the privilege.

We find that exclusion of these documents did not prejudice plaintiff because the testimony of defendants' witnesses fully brought out the underlying facts and circumstances noted in the exhibits. We do not intimate that the exhibits were inadmissible.

We find no reversible error.

AFFIRMED.